Please rise. This court is now in session. Honorable Justice Keith Scott Neville presiding. Good afternoon. Please be seated. Madam Clerk, we have a special session, afternoon session of the appellate court. Would you call the only case that's on our call this afternoon, People v. Hauad, please. Will the attorneys please step up to the podium. When you step up to the podium, I'd like the appellate to go first. I want you to tell me your name, who you represent, and approximately how long your argument will take. Counsel, you can step up as well. Good afternoon, counsel. Good afternoon, Your Honor. Rachel Cowen from DLA Piper on behalf of the appellant, Jaime Hauad. We have 20 minutes. How long we take really depends on how many questions you have. If you had no questions, I wouldn't take more than 10 or 15 minutes. How much time do you want for rebuttal? I assume that we have 10 minutes, and I think that's sufficient. We'll give you as much time as you need. This is a special afternoon session. Thank you, Your Honor. Good afternoon, counsel. Good afternoon, Your Honor. It's Christine Cook, Assistant State's Attorney on behalf of the People. I expect to take about the full 20 minutes. Very good. Ms. Cowen, why don't you proceed with your argument. Before you start, how do you pronounce the defendant's name? Hauad. Hauad. Yes. I hope I have that right. I've been representing him for four years. You'd think I'd know by now. Hauad. Five years. Five years. May it please the Court. Your Honors, we're here today on appeal from a denial of leave by Mr. Hauad to file a successive post-conviction petition. And this is his fourth petition, correct? This is his fourth petition, yes. This petition was filed as both an actual innocence petition and a cause and prejudice petition in which we brought forth five pieces of evidence, each independently establishing new, non-cumulative evidence that would probably lead to a different trial result, as well as demonstrating in two of those instances a constitutional defect in the underlying proceedings. First, on June 18, 2014, the Illinois Torture Inquiry Commission issued an order of referral asking the Cook County State's Attorney to investigate Mr. Hauad's conviction in corroborating that an alleged false alibi that was given by Mr. Hauad during an interrogation was given under duress and during a period in which he was coerced and abused. In March of 2014, counsel for Mr. Hauad submitted a request and received a response from the California Department of Motor Vehicles that Luis Contreras, the sole eyewitness to the shooting, had submitted a driver's license or state ID for which there was no record suggesting a false ID had been submitted. We then searched through additional databases that had become available since Mr. Hauad's conviction and learned that the eyewitness had also used four different Social Security numbers during the time that she, prior to that, thereby suggesting that she may have been in this country illegally and susceptible to pressure from the Chicago Police Department over her immigration status. Well, you go from suggesting that she may have been in the country illegally to, in your reply brief, I think you say it's virtually certain that she was in the country illegally. I don't see where that follows. Well, Your Honor, I believe that there is very strong evidence that would suggest she was in this country illegally because of her ID. There is no record of anybody named Luis Contreras ever holding a state ID in the state of California. So what she submitted to the police when she gave her initial statement, this person doesn't exist. And so tell me, tell me from there, you draw, you argue that somehow the state's attorney should have known and should have investigated the identity of Luis Contreras and should have come up with this evidence and should have turned it over. Is there any case that holds that? I believe that Brady and Giglio do establish that they have a duty to investigate. And here, this wasn't a very difficult investigation. But Brady and Giglio talk about criminal background. Well, it's not the immigration status. Is there any case that talks about a prosecutor having a duty to investigate the immigration status of a witness? I believe that you have to read the cases together, Your Honor. One, if you look at U.S. v. Blanco from the Ninth Circuit, Brady-Giglio was violated where the prosecutor failed to disclose immigration-related information. And the prosecutor there argued they didn't have the information, only the DEA did, because it was a confidential informant. And the Ninth Circuit said this responsibility goes to the entire government. Second, we have a situation where... Again, get me back. The prosecutor in this case. Here, what we have is what basic... So somebody somewhere in the country knew that Luis Contreras didn't have a California state ID, and that knowledge is imputed to the prosecution. Here, the knowledge is imputed to the police department and, by virtue of Brady-Giglio, to the prosecutor. And what was imputed is that somebody submits an ID. This isn't a significant investigation. If you were to give me your driver's license, Your Honor, it wouldn't be very hard for the prosecutor and the police department to figure out you don't exist. That basic piece of information, which is impeachment evidence, that Giglio does require to be disclosed, is pretty simple. So, again, I'm trying to define the prosecutor's duty. The prosecutor's duty is to run a background check on every witness? Yes, there is some basic information that the prosecutor... Not just for criminal background. Just, are you who you say you are? They have to do that in every case for every witness. Well, it's impossible not to do a basic background check when looking into someone's criminal background to say, are you who you say you are? I'm not suggesting that this was something that required thousands of hours or significant resources. The most basic piece of information here, do you exist? That should have triggered something, some basic investigation and some disclosure. It's impossible to believe that the Chicago Police Department did not do anything to say, who is this person? And then when it comes back, they don't exist, have no disclosure responsibility. When did it come back that she didn't exist? Pardon? When did it come back that this witness who testified at the trial didn't exist? We don't know what the Chicago Police Department did. What we know is that when we did the basic search, once this became available to the general public, it came back immediately upon a one-page inquiry. But your position is the police have a duty to conduct that search. Yes, my position is that the police have a duty to conduct a basic search. And here, a basic inquiry into their criminal record would have revealed the immigration status or some question about it. And that would have triggered a duty to disclose. But again, this is one of five pieces of evidence, any one of which we believe is new evidence that authorizes us to file this petition. Third, our third piece of evidence. On August 14, 2014, we received an affidavit from Miguel Morales stating that the surviving victim, Miguel Salgado, had confided on the day of trial that he was providing false testimony implicating Mr. Hawad in the crime because the Chicago Police Department had threatened to deport him. And again, where's the affidavit from Mr. Salgado or the attestation that we tried to get one and he refused? I'm sorry, I'm not following you, Your Honor. That affidavit was attached to our petition. The affidavit from Mr. Salgado. Mr. Salgado said, I falsely identified him. He didn't say anything about why. Then you come up with Mr. Morales' affidavit who says, Mr. Salgado told me why he's recanting. But there's nothing in the petition to say we asked Mr. Salgado about this and either he refused to cooperate or we couldn't find him or what. Because what Mr. Morales says Mr. Salgado told him is hearsay. Well, again, Your Honor, we have submitted an affidavit in prior proceedings of Mr. Salgado who does say that the police threatened to pin the crime on him and that he testified falsely. The Morales affidavit supplements that. The linchpin here, though, between Mr. Salgado and Ms. Contreras is we didn't know that the police had threatened Mr. Salgado with his immigration status. And so now we believe that they threatened Ms. Contreras in the same way. Well, again, that's your new fact, right? Well, those are fair inquiries for a Stage 3 evidentiary hearing. At the pleading stage, we've come forward with the affidavit. You said it's hearsay, but I would remind you, Your Honor, that the rules of evidence actually don't apply to post-conviction proceedings under Illinois Rule of Evidence 1101. In addition, Mr. Salgado's statement to Mr. Morales that he was threatened with deportation is a statement against his interest because it's effectively an admission that he's here illegally. He's not the declarant. Mr. Morales is. And from Mr. Morales, it's hearsay. The statement from Mr. Salgado to Mr. Morales is an exception to the hearsay rule. The statement from Mr. Morales is an attachment to a petition that is subject to coming in. It's hearsay. But the rules of evidence don't apply. I'm not so sure about that. I'm not so sure that a petitioner under the Post-Conviction Act can say the rules of evidence don't apply, and that excuses me from providing you with the basis for my successive post-conviction petition because the rules of evidence don't apply. I'm not aware of any case that says that. In 2013, the Illinois Rules of Evidence 1101 was amended and now makes clear under Section B3 that the rules of evidence do not apply to post-conviction proceedings, which this Court recognized in People v. Jones this summer. 2016, they'll add first, 1, 2, 3, 3, 7, 1. And so you read that to say that a post-conviction petitioner who wants to file a successive seeking leave to file a successive petition need not adduce any admissible evidence. We can have hearsay on hearsay on hearsay, and that's enough to get you to the third stage. No, I would refer you, Bev, also to People v. Warren, affidavits from witnesses who say they heard the real shooter confess to the crime are admissible in the post-conviction petition because they are statements against interest. 2016, they'll add first, 090884. And again, there is whether there is some indicia of reliability is what Warren is looking at. And I would say to you that there is an indicia of reliability here. Mr. Salgado had already admitted that he falsely pinned his ID on Mr. Hawad because he'd been pressured by the Chicago Police Department, and whether he would come forward to us and further admit. Well, I don't have it in the record, but I can share with you that he had been asked to in this country. Well, I'm not interested in what's not in the record. You're asking me why he wouldn't come forward and say that. I'm saying why there is no representation that we approached Mr. Salgado to confirm what Mr. Morales said, and Mr. Salgado said, I won't cooperate with you. Or, yes, I will. Here's my affidavit. I'm going to tell you exactly why I testified the way I did. Because that's not our responsibility at Stage 1 when we're merely seeking leave. That is an appropriate inquiry into whether the statement is credible at Stage 3. And this court in Toronto, Ann Montanez, actually cautioned trial court judges about weighing the evidence and making these credibility determinations. I hear what you're saying, Your Honor, which is you feel that there may be some reason to disbelieve the statement, but that's not an appropriate inquiry at Stage 1. It's an initial burden. Our initial burden is to submit the evidence in a form that could later become admissible. We submitted an affidavit from a gentleman who will testify live, and the only issue is what he heard is whether it's hearsay. And what I am arguing is that, one, that's not the relevant inquiry in the court below because the formal rules of evidence don't apply. And even if they did apply, there is an exception to the hearsay rule for a statement against interest. In an admission by Mr. Salgado that he could be deported, it's not surprising that he didn't want to run around telling people he's not here legally and that the pressure that came to bear on him was something that might force him to leave this city and this country. So it is appropriate to attach at the initial pleading stage the Miguel Morales affidavit. Mr. Morales can and will testify at the hearing, and we should be permitted to at least bring the claim forward. It should not have been dismissed or leave denied merely because people have questions about the credibility of Mr. Morales or why Mr. Salgado didn't come forward himself. Those are the inquiries that should be made at Stage 3. Our fourth piece of evidence. A December 16, 2012 affidavit from David Ruiz, a former high-ranking member of the Maniac Latin Disciples, stating that Mr. Jose Morales, the leader of the West Side faction of the Maniac Latin Disciples, admitted that he ordered Nick Moropoulos to shoot Mr. Morales, Burrell, and Salgado as part of an intra-gang struggle. And here we have now an affidavit in 2012 stating and identifying the real shooter. On January 17, 2013, then Assistant U.S. Attorney Manish Shah, who is now a sitting district court judge in the Northern District of Illinois, provided a letter stating that on August 2, 2001, David Hernandez, a high-ranking member of the Maniac Latin Disciples, made statements during a formal proffer session that he was at Hoops Bar on the night of the murders. He stated that Mr. Moropoulos was at the bar that night and flashed a gun, stating, I'm going to take care of some business. Mr. Hernandez then got into a car with Jose Morales, the same individual that David Ruiz has admitted to ordering the murder. They drove into an alley where they witnessed Moropoulos shoot all three victims. That letter was dated January 17, 2003? Thirteen. Thirteen? Yes, Your Honor. Okay. The statements made by Mr. Morales and Hernandez are consistent with other evidence that was submitted previously, including the fact that Mr. Moropoulos, whom both Mr. Morales and Hernandez identified as the shooter, drove a red Toyota Tercel. And if you'll recall, there was a statement at the time that the murder occurred from a resident who had heard the gunshots, looked out his window, and saw a small red car, possibly a Toyota, speeding away from the scene. And then you have Mr. Moropoulos' letters to Mr. Hawat and his mother expressing remorse over the fact that he's in prison for a crime he didn't commit. And we believe that the letter from Mr. Shaw, now Judge Shaw, and the affidavit from Mr. Ruiz coupled with these independent facts demonstrates that, in fact, if a jury heard these facts, the outcome would probably be different. Again, here the standard of review at this court is de novo. And with regard to a successive petition, first on the actual innocence, leave of court should be done only where it is clear from a review that the petition and documents submitted cannot set forth a colorable claim. Here, is there anything about what we've presented that gives someone pause for concern that Mr. Hawat might be innocent? Is there anything colorable about those five factors, both independently but also when read together against the backdrop of the strength of the trial evidence, that could potentially alter the outcome, or probably alter the outcome, if the jury heard it? Here, they most certainly do. And again, under the clause in prejudice standard, leave should be granted if the motion sets forth adequately facts alleging cause and prejudice. Here, we merely need to allege facts. Then time to weigh the credibility of those facts and get into the type of inquiry Your Honor was discussing is not at Stage 1, not at Stage 2. As this court has recognized in Serrano and in Montanez, the first and only time that the court should be weighing evidence, looking at credibility is at Stage 3 after a full hearing on the merits. But you concede that this is not a first stage, first post-conviction analysis. It's a successive, and indeed third successive, post-conviction petition. So it's not the extremely lenient standard of a first stage, first post-conviction petition, right? I agree that the standard is different. I don't agree or concede that this standard forecloses us. I believe it's still a very light standard at the stage we're at, which is simply leave to file. And here, the court is supposed to accept all of the facts as pleaded. There isn't to be any weighing of credibility. And that's what we believe happened here inappropriately. Judge Sachs weighed the evidence, dismissed some of these new allegations because he believed that they were incredible, that our allegation that we didn't or couldn't have discovered them sooner was not trustworthy or not credible. And I'd like to go through, in some detail, some of the criticisms that came from Judge Sachs and from the state's attorney in the briefs first. With regard to the Torture Inquiry Review Commission, it is new evidence. The statute wasn't passed until 2009, and we did not obtain this report until 2014. But the commission report just recounts what your client said. They didn't do an independent investigation. They said, wow, that sounds terrible. We think the state's attorney should investigate, right? Well, they did do a comprehensive investigation. They interviewed Mr. Hawad. They reviewed all the evidence. That investigation was conducted in part by Barry Miller, who is the former general counsel of Harvard University and a former assistant U.S. attorney. But it is a reassessment of the evidence nevertheless, correct? That's what the commission's job is to do. They receive claims, and they are to be an independent body that reviews them. And that's precisely what the Torture Commission's role is. We're talking about nine panelists who are former jurists, state's attorneys, former members of the clergy, members of universities who teach, who come together and hear the evidence and make determinations. And nine people, along with the administrator, determined that there were facts in this case that were deeply troubling that suggested Mr. Hawad may be innocent of the crime.  And that nonbinding report that they were permitted and compelled to issue under 775 ILCS 4045 is new evidence under Rice and its progeny. In fact, I would point you to Alma Dobar, where the plaintiff or the defendant there claimed that the new evidence was an article in the Chicago Tribune. Any type of subsequent evidence that is reliable or credible that gives corroboration is new evidence. Both Judge Sachs and the state's attorney took issue with the fact that Mr. Hawad did not actually confess, so it made other inculpatory statements the alleged false alibi. But again, there weren't... How is an alibi statement inculpatory? It's exculpatory. Well, in this case, it was deemed inculpatory. In fact, I believe Judge Sachs referred to it as very damaging in his sentencing. It's damaging in the sense that if you lie to the police about the fact that you were in jail when you weren't in jail, that doesn't help you. But an alibi telling the police I didn't do it because I was in jail is exculpatory as far as the defendant is concerned. Again, Miranda and People v. Lurie do not distinguish between confessions and other inculpatory or exculpatory statements, nor does Rice. The point being that any statement that is used against somebody made during an interrogation by which torture occurs is unacceptable, that it cannot be admitted, and it is not subject to a harmless error standard. But to your point, Your Honor, think about it from a different perspective, which is here the gist of the state's argument and what Judge Sachs found very damaging was the chronology that Mr. Hawad allegedly provided regarding his detention and the alibi. Think about how reliable your statements would be about where you had been and what you were doing if you had been beaten and slapped for multiple hours and then somebody put your feet onto a paper grade cutter and cut the toe caps of your shoes off. Nothing said during that detention is reliable or admissible. And now we have independent corroboration of that allegation and that is the new evidence that entitles us to come forward. The state's attorney has also raised in their brief that Mr. Hawad has waived his right to bring this argument forward because during his suppression hearing, he did not allege or bring forward personally the allegation about the toe caps of his shoes being cut off. And I would point the court to three cases that explain why that is not dispositive and does not constitute a waiver. First, People v. Wuerl, 2015 1-1-1-4-8-3. Following a Turk referral, there was a dispute between what the defendant had raised in the Turk proceedings and what he had raised at the suppression hearing about whether somebody shoved a potato chip bag down his throat to effectively torture him during that detention. And this court explained that those kinds of factual inconsistencies do not necessarily preclude the claim. Because Mr. Wuerl had complained from the get-go. And so has Mr. Hawad. He said, I don't want to plead guilty because I didn't do it. And he had complained about torture. Mr. Hawad has steadfastly maintained that he was tortured throughout. Right. And he brought it through to a suppression hearing. Right. He raised the shoes and Javier De Jesus, the gentleman that he switched with, were put on the witness list and on his exhibit list. Let's stop at the suppression hearing. At the suppression hearing, he claims, I was beaten, I was kicked. Yes. Tell me why a defendant who's saying I was tortured in police custody would not then say, and by the way, they threatened to cut my toes off with a paper cutter. He was waiting for his lawyer to ask those questions. He's 18, and his lawyer shuts down the investigation and the examination. He's 18. He's relying on his lawyer's advice. And we can ask his lawyer. He's told us and admitted he didn't raise it because he believed that it was not appropriate at that point. We don't exactly know why. We've never gotten a good explanation from him. But here, just as in Wuerl, Weathers, and Warren, Mr. Hawad absolutely always maintained that he was beaten and abused during that detention. Unfortunately, his counsel did not ask, and Jaime, who was just 18 at the time, did not question his attorney's judgment. He did raise the issue after he finally had begun bringing these claims on his own in his first pro se post-conviction petition. And he also raised ineffective assistance of counsel throughout the trial and the first appeal process. And in Weathers, 2015 LAP 133-264-2015, Mr. Weathers also had come forward to this court on a successive petition. He claimed that he was tortured and abused during his interrogation and gave a confession that was coerced. He also failed to mention or bring forward in a suppression hearing that torture. He had originally raised it to his counsel. His counsel withdrew the request for a suppression hearing. And there, too, the state argued that Mr. Weathers' failure to raise it in the trial court below meant that he could not bring it on a post-conviction petition following a TURC award. And this court said, that's not the relevant inquiry. The inquiry is whether the TURC award is new evidence and how bad it is. Here, too, Mr. Howard's TURC referral is new evidence. And finally, I would refer this court back to People v. Warren, 2016 ILAP 1st, 090884. If you'll recall the facts, Mr. Warren asked a lawyer to handle his first post-conviction petition. He had referenced to his lawyer people to obtain affidavits from. That lawyer gathered the affidavits but never got them executed, never submitted them. And this court recognized that it was simply lack of diligence on the part of his counsel. When he came back on his second petition, those affidavits were executed almost a decade later. And this court said, it would be fundamentally unfair to deny defendant an opportunity to present this evidence, to bar it because it is not technically newly discovered. In any real sense, the evidence of these four witnesses' testimony was not available to a defendant whose lawyer would not submit them. The ultimate underpinning of the actual innocence of a fundamental miscarriage of justice exception is that no person convicted of a crime should be deprived of life or liberty given the compelling evidence of actual innocence. And that is our case here. The evidence of the torture is real. It deserves to be heard. An independent body specifically designated by statute to make these reviews has concluded that Mr. Hawad was tortured and has specifically asked the state's attorney to investigate this case. That is the hallmark of a coverable claim. Again, the Morales affidavit, the Ruiz affidavit, and the U.S. Attorney's Office letter, the criticism is once again that it is only hearsay. I think we have covered that. I believe that hearsay is not the relevant issue. It does not apply to post-conviction proceedings. But with regard specifically to the Manish Shah letter, stating that Mr. Hernandez during his proper had identified the real killer, I would remind this Court that a proper session is a formal setting in which Mr. Hernandez is compelled to tell the truth in exchange for a plea agreement. This is a memorialization of notes that happened before a proper session to the U.S. Attorney, the FBI, and the Cook County State's Attorney. This was in 2001. It was in 2001. We did not know about it until 2013 when my partner John King, who is a former U.S. Attorney that tried several of the Maniac Latin Disciple cases, called Mr. Shah personally and asked him to search for any evidence of a proper session. At that point in time, we had no idea. Is there any indication in the record that it was sent to his then-attorney? There is no indication in our record. I can tell you what transpired. Again, that would be appropriate for a Stage 3 hearing. Here, what we've pled and what the Court must accept at this stage is that this became available to us in 2013. If there's any doubt as to why there was a 12-year lag, we certainly can bring forward evidence at the Stage 3 hearing, but clearly we've pled, and I am confident that it is truthful and accurate, that my office discovered this in 2013 and obtained the letter. That's my credibility as a lawyer standing before you that it was not available before them. It does have independent indicia of reliability because of the setting in which it was given. I would also point out that there is some suggestion that because this isn't DNA evidence or some other type of evidence that affirmatively establishes Mr. Hawad's innocence, that it is less reliable or less appropriate. I would come back to People v. Smith, 2015, ILAP 1st, 140494. There, a witness recanted his identification and stated that he'd heard from others that someone named Spanky committed the crime. The witness didn't even know who Spanky was or his real name. The state characterized the affidavit as mere impeachment evidence rather than affirmative evidence of innocence insufficient to support an actual innocence petition. And this court rejected the state's argument stating that the affidavit proffered by Smith was sufficient because it, quote, exonerates him altogether and names a different perpetrator. As such, his testimony could lead to a different result in a new trial. We believe that these five pieces of new evidence, whether as an actual innocence petition or the issues regarding Luz Contreras' immigration status and the coercion of the false alibi as constitutional deprivations under the Fifth and Sixth Amendment, more than satisfied our pleading standard in order to obtain leave to bring this claim forward. Anything further? Do you have a question? Anything? Okay, why don't you bring the argument to a conclusion so we can hear from the state. Thank you, Your Honor. I will do that. Very good. Ms. Cook. Good afternoon. May it please the court, counsel, This court should affirm the lower court's denial of leave to file this fourth successive post-conviction petition. I'd like to start talking about the use of the false alibi regarding the self-incrimination claim first, if I may. Of course, this claim has utterly been waived. Defendant never claimed in the motion to suppress statement that he was tortured by having his shoes cut. The shoes were never raised until many, many, many years later. The defendant has a legal and, of course, a logical obligation to raise these claims below where they can be properly litigated. It was never raised in the motion to suppress statement and it was never raised in his first post-conviction petition. The basis for his motion to suppress statement was that he had not received his Miranda warnings and that his right to counsel had been affirmatively denied him. No Jim Shue claim had ever been raised. Then, of course, this court is barred by the doctrine of res judicata. This is the identical claim and the identical evidence that the defendant raised in his second post-conviction petition. In that petition, the lower court denied leave to file, finding that the defendant failed to establish either cause in prejudice or a colorable claim of actual innocence, as this could never be deemed newly discovered evidence. And this court affirmed, there is nothing new in the torture claim before this court that will allow it to review this claim substantively as it is barred by waiver and res judicata. Even affirmatively reviewing the substance of the claim, the defendant will never be able to establish cause. After all, the shoes are his and the shoes, by his own version before this court, have been in his mother's possession for 17 years. DeJesus and his mother have always been available to testify and they have never been brought forth to do so. And in fact, the defendant's shoes were mentioned in the motion to suppress statement. Assistant State's Attorney Karen Hodge testified that when she was interviewing the defendant at the police station, the defendant's own mother came into the police station and brought him a pair of shoes. I don't know why. I don't know what the circumstances are. But there was testimony at the motion regarding the change of shoes in the two lineups. Clearly, defense counsel knew about the change of shoes. They're evident from the photos. It was testified in the motion to suppress. And there has never been a claim that counsel has been ineffective for failing to raise this claim. Most notably, because when Mr. Mottweiler testified before the Turk Committee, he testified he knew about the shoes. And had the defendant told him he was tortured, he undoubtedly would have included that claim in the motion to suppress statements, which explains why it was never litigated because the defendant never made the claim to his attorney. Regarding the Turk Commission, this cannot be used to establish cause. As this court has noted previously, this is merely a repetition and acknowledgement of the defendant's recycled claims from the second post-conviction petition. Nothing in the Turk Commission adds to these claims. There's nothing in the Turk Commission that has corroboration of the claims, unlike People v. Rice. In People v. Rice, that defendant had always steadfastly claimed that he had been physically abused by two specific and identified police officers. He reported that abuse to intake. That was the basis for his motion to suppress. He testified to it at trial in his post-conviction and his successive post-conviction. And in the motion to reconsider, he was finally able to corroborate those claims with OPS reports regarding those officers and prior abuse by them. The OPS reports were the cause which corroborated the claim before Turk. That could not have been raised earlier. You cannot use the Turk Commission itself, which is merely repeating the claims, as a cause or a prejudice argument in this argument. There's merely another body's interpretation of the same evidence, evidence which this court has rejected when it affirmed denial of leave to file the second post-conviction petition. Further, Turk has not made a torture finding. They found that there was sufficient evidence of torture to merit judicial review. And, of course, we disagreed based on the facts and the law. Turk didn't have a full record like we did in this case. And Turk is not obligated to analyze either under a cause of prejudice or under a freestanding claim of actual innocence under the Act. Again, res judicata bars this claim from being recycled once again. Further, regarding the claims of alleged torture, there is no link between the false alibi and the claim of torture. And, in fact, a review of this record shows that a false alibi was the defendant's narrative from the moment he was picked up at arrest. As he was being put into the police car, he told the officers that he didn't know, let's see, by Detectives Echevarria and Moscata, as he was getting into the squad car, he said, and I quote, I know my heart is clear because I was in the county when that shit happened. That statement will never be implicated by a torture claim, nor will the first time that Detectives Engel and Vergara talk to the defendant, which also predates any claim of torture. When they first spoke to the defendant, an hour after Contreras identified the defendant in a physical lineup, in response to where he was, the defendant said again that he was in county jail from the 21st to the 24th, and that he had been arrested around noon, taking his younger brother to kindergarten when he was stopped for traffic and a warrant had popped for his arrest. There is no link between those two false alibis and any alleged coercion. So no matter what happens, those two false alibis are coming into evidence and are not implicated by the coercion claims. A trial court in this case never made any credibility determinations, but what has to happen in a successive petition is that the court has to look at all of the evidence, not just presented to it in the successive petition, but that in comparison and in context to the entire trial record. That's what the trial court did in this case. He noted all of the discrepancies where the new claims before the court were in direct contrast to that and were affirmatively rebutted by the record. Those weren't credibility determinations. That was a cause and prejudice analysis and was wholly appropriate. Any reliance upon the Javier De Jesus 2002 affidavit is most inappropriate. Again, that was an affidavit that was executed in 2002 regarding a torture claim. As Justice Mason noted, there is no affidavit before this court today regarding Mr. De Jesus. This is an old affidavit, and it's barred by race judicata. What about Ms. Collins' argument that the rules against hearsay don't apply so that the Morales affidavit doesn't matter, that he's recounting what Mr. Salgado told him, that's enough to get him in the door? No, that's not right. And as Your Honor noted, it's not a matter of hearsay. The test for a successive petition in a constitutional claim is that the defendant has to meet a cause and prejudice analysis. In the claim of an actual innocence claim, the defendant has to present newly discovered evidence available through the exercise of due diligence that's material and not cumulative and is of a conclusive character that would probably change the result at retrial. The Miguel Morales affidavit in no way supports the claim of actual innocence. It's not newly discovered. After all, according to the Morales affidavit, he was standing on the porch when the police came to take Salgado to testify to the trial. He's always been available. Due diligence requires that somebody complete an investigation, and nobody has. And again, defense counsel has never been alleged to have been ineffective for failure to do so. Again, Salgado provided an affidavit in Post-Conviction No. 2, which they are now asking this Court to look back and rely upon in context to move his claim forward, but that's an inappropriate request to do. The petition must be supported with competent evidence, and this is not competent evidence. The commission cannot be used to support a claim of actual innocence as it is merely an acknowledgment and an affirmation of what the defendant is claiming and is not a finding. The Miguel Morales affidavit does not support a claim of innocence. It's not newly discovered. It's also barred because of res judicata. This claim has been previously raised and litigated. It's also inadmissible. It is reintrusive. Justice, as you noted again, it's not a statement against Salgado's interests, and furthermore, Morales was never even a witness. So his affidavit, it doesn't undermine the contrarious identification. It doesn't undermine the defendant's repeated false alibis, and it doesn't undermine Salgado, who was never able to identify the shooter. The counsel addressed the question of whether or not the rules of evidence apply in post-conviction proceedings. Do they or don't they? Well, according to the rules of evidence, I believe those rules of evidence are more applicable to a third stage hearing. Those rules do not excuse a defendant from having to meet the actual innocence test, that being unavailable through the exercise of due diligence, material and not cumulative, and of a conclusive character that it would probably change the results at retrial. The rules of evidence don't change the standard and the burden that the defendant has. And in this case, the defendant cannot meet any of those burdens. Regarding Ms. Contreras, the defendant merely claims that Ms. Contreras was an illegal alien. That is an enormous jump. It's based on nothing. And then there's a further leap. So not only is she just presumed to be an illegal alien, but then there's another logical leap that, therefore, she must have been intimidated by the police and falsely identified the defendant. And there's no evidence before this court to support such a claim. I would like the court to note that in the police reports, Ms. Contreras is identified as a Guatemalan national and her California driver's license is listed repeatedly on the police reports. Again, defense counsel knew about Ms. Contreras. And although counsel today says there was no evidence the police conducted a search about Ms. Contreras, the simple fact of the matter is that there's no evidence that they didn't either. Doing a Westlaw or a Lexis search on Ms. Contreras all these years later is in no way sufficient to meet a cause, a prejudice, or an actual innocence claim. There is nothing before this court that Ms. Contreras was an illegal alien, that she falsely testified, or that she made any mistakes. And as it was noted earlier, the people were under no obligation to research Ms. Contreras' status as an immigrant. There is no case law to support such a notion. And according to our brief in Tercios and Rawls, there's no Brady violation here, and we are not supposed to be conducting those types of background checks. Regarding the letter from U.S. Attorney Shaw and the David Ruiz, we'll call him David Ruiz too because there's two David Ruizes. The first one was in Woops Bar, and then the second David Ruiz was with defendant when he got pulled over for the traffic stop shortly after the murder. Again, this is a letter from 2001, and once again, based on the record before you, that information where they're trying to assert that Mr. Moropoulos is the real killer, that information was disclosed to defense counsel in 2001. It is unclear from Mr. Shaw's letter as to whether Mr. Hernandez was under oath, presumably he was, but there's no evidence that he was. And again, there's no affidavit by Mr. Hernandez before this court that identifies Mr. Moropoulos as the shooter. Because this letter is dated in 2001, and because defense counsel knew about this information in 2001, it's not newly discovered. It can't be deemed new just because the defendant now knows about it or wants to know about it. There's also a lot of information in this record regarding Moropoulos being the real shooter, regarding the color of the car he drove, this maroon Toyota. Again, I would like to turn your attention to the record where the maroon Toyota is again replete in the police reports. It shows that when Salgado went to J.J. Peppers to make the phone call to his mother, he passed out in the lobby. When the police responded, he told the J.J. Peppers clerk that three to four men in a black maroon car shot him. And then there are witnesses that saw a four-door Toyota and a cargo van with blue stripes. The record also shows that this may not have just been one shooter or that he may not have been alone. Many people talk about hearing footsteps going into the alley. Both Ms. Contreras talks about that. Salgado mentions it. It's not really clear if it's just one person or if it's multiple people, but the police reports also show that the police were looking for a person named Red in conjunction with this investigation. So this wasn't just an investigation where the defendant was arrested and the police didn't do anything to finish up the investigation. That's clearly refuted by the record. Further, we know that Meropolis is not the man Contreras saw because she identified the man standing underneath her window with a tattoo on his right forearm, just like the defendant has. And according to the IDOT website, Meropolis does not have a tattoo on his arms. The Meropolis letters, if the court has read them, are rather meaningless. They're vague. They're confusing. And under no circumstances can it be credibly alleged that he is confessing to a murder, that he's talking about a murder. A lot of it is gang bantering about, about love you brother, I'm here to support you, sir, you're getting hung up on things. It is completely speculative and conclusory to claim that those are letters confessing to his guilt in this murder. That's absolutely not true. Last, regarding the David Ruiz 2 affidavit. He also claims that on the night of the murder, the defendant had picked him up and drove him to the shooting. About a week later, Detective Maginuski picked him up and told Ruiz he needed to put the defendant in his car at the time of the murder, and then he gave Ruiz a look he will never forget. According to the Ruiz 2 affidavit, Morales had ordered the shootings over a gang power struggle and had hired Morales to take care of the shootings and that it wasn't the defendant's job to do the shootings. Again, not newly discovered, where has David Ruiz been for 15 years? He has been available. There's no indication he was unwilling to testify to that. He wasn't able to be found. And again, this is information disclosed to counsel in 2001. He was known to the defendant. He was available prior to trial, and he was with the defendant in the car that night. It also is not material. It's hearsay. It's not against Morales' penal interests. And in fact, as the trial court noted, he collaborates Officer Lutzen, who placed the defendant at the scene right after the shooting. And his affidavit contradicts the defendant's own statements to the police, that being the false alibi, nor is he a witness to the shooting. Again, these are not well-pled facts. Based on personal knowledge, they are not competent evidence to support any notion of actual innocence. Regarding the trial court below asking for not only a remand but a reassignment, the defendant here must show substantial prejudice and must overcome the presumption of impartiality. The defendant in this case has taken isolated comments completely out of context to create a perception of personal bias. This record is replete with fact that shows that this court spent an inordinate amount of time reviewing this very lengthy record, the very lengthy litigation by the defendant, reviewed the facts, the nature of the defendant's latest post-conviction claims, and correctly applied the law. There would be no need for reassignment even if this case went back. Based on all of these arguments here today and those submitted in our brief, the people respectfully request that this court affirm the denial for leave to file the fourth successive post-conviction petition. Any questions? Thank you, Ms. Cooke. Ms. Cowan, some brief rebuttal? Yes, Your Honor. I believe the State's Attorney has now spent her entire argument doing precisely what this court said she is not to do in People v. Jones, 2016, ILAP 1-123-3371, and that is recount the trial record outside of our pleadings and argue about why the things we've brought forward are not believable, are inconsistent with the record, or should not be permitted to be pled. That is not this court's role, and that was not Judge Sack's role. We also vigorously dispute many of the characterizations of the evidence. For example, what Mr. Mottweiler or Ms. Hodge testified to in front of the Turk. We vehemently disagree with some of the characterizations, for example, where the evidence has been. Those shoes were not in Jaime's mom's possession for 17 years. They remained with the circuit court. But that's precisely the type of thing that this court should not be engaging in, which is do you believe Mr. Hawad's allegations? Do you find them credible? The only question is whether as pled, if true, they raise a colorable claim of actual innocence, or whether the facts as pled give cause and prejudice to the fact that a constitutional deprivation has occurred. With regard to the argument about why certain things are not new evidence, under the state's attorney standard, virtually nothing would be new evidence, because of course all facts that exonerate someone occurred at the time of the crime. The issue isn't whether the fact existed at the time of the crime. The issue is whether they were available to the defendant. And here I will count only a few examples. For example, the letter from the U.S. attorney. First of all, it's not dated 2001. It's clearly dated 2013. There is no evidence in the record about what was made available to Mr. Hawad's attorney and when. The U.S. attorney couldn't possibly speak to what the state's attorney disclosed to Mr. Hawad's counsel. And that type of evidence is precisely what should come forward at a stage three proceeding. But in fact, we've pled, and honestly and accurately so, that that information only became available to us in 2013. It was not available to us sooner. With regard to remand to another judge, I do not take that request lightly. In the 20 years that I have been practicing law, I have never once asked for a judge to be recused or to ask for a matter to be remanded to a different judge. I am well aware of the extraordinary nature of the relief we seek. But this court, on three separate occasions, has recognized that there are certain extreme circumstances that require it. Sometimes the frustration of managing a case for 20 years leads someone like Judge Sachs to pre-judge the evidence. The judge has made it clear he hopes that you all make sure this case never comes back to his courtroom and that Mr. Hawad never files another post-conviction case again. There are statements in the record suggesting even disdain for counsel, the Turk. It is an extraordinary request. But we believe, just as in Reyes, Serrano, and Montanez, this is one of those rare circumstances where remand to the court, which by the way is not merely overseeing a trial on the merits, but is the finder of fact in this stage of the hearing, would not be objective and would not be just and fair to Mr. Hawad. So we would ask that you reverse the court's refusal to grant leave to file the petition and that you remand it to a different judge so that Mr. Hawad can bring his claims of actual innocence forward. Thank you. Thank you. I want to compliment Ms. Collins and Ms. Cook on their advocacy this afternoon. I want to thank you for the briefs. This matter will be taken under advisement and this court stands in recess. Thank you.